1

UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF NEW YORK

Case No. 08-47472

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


AGRIPROCESORS, INC.,


        Debtor.



- - - - - - - - - - - - - - - - - - - -x


                United States Bankruptcy Court

                271 Cadman Plaza East

                Brooklyn, New York


                November 10, 2008

                11:10 AM


B E F O R E:

HON. CARLA E. CRAIG

U.S. BANKRUPTCY JUDGE

2

1

2     HEARING re Order Scheduling Status Conference for the Purpose

3     of Determining an Appropriate Schedule for the Proper

4     Administration of this Case.

5

6     HEARING re Proposed OSC to the Motion to Change Venue/Inter-

7     District Transfer - Bankruptcy to Northern District of Iowa,

8     Debuque Division.  Filed by Michelle McMahon on Behalf of

9     Agriprocessors, Inc.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Pnina Eilberg

3

```
 1
 2     A P P E A R A N C E S :
 3     FINKEL, GOLDSTEIN, ROSENBLOOM & NASH LLP
 4          Attorneys for Debtor
 5          26 Broadway
 6          New York, NY 10004
 7
 8     BY:   NEAL M. ROSENBLOOM, ESQ.
 9
10
11     BRYAN CAVE LLP
12          Attorneys for First Bank Business Capital
13          211 North Broadway
14          St. Louis, MO 63102
15
16     BY:   BRIAN C. WALSH, ESQ.
17
18
19     BRYAN CAVE LLP
20          Attorneys for First Bank Business Capital
21          1290 Avenue of the Americas
22          New York, NY 10104
23
24     BY:   LAWRENCE P. GOTTESMAN, ESQ.
25
```

4

1

2     PERETORE & PERETORE, P.C.

3          Attorneys for National City

4          191 Woodport Road

5          Suite 207B

6          Sparta, NJ 07871

7

8     BY:   FRANK PERETORE, ESQ.

9

10

11     UNITED STATES DEPARTMENT OF JUSTICE

12          Office of the United States Attorney

13          271 Cadman Plaza East

14          Brooklyn, NY 11201

15

16     BY:   DAVID M. ESKEW, AUSA

17

18

19     UNITED STATES DEPARTMENT OF JUSTICE

20          Office of the United States Trustee

21          271 Cadman Plaza East

22          Suite 4529

23          Brooklyn, NY 11201

24

25     BY:   LINDA A. RIFFKIN, ESQ.

5

1

2    SONNENSCHEIN NATH & ROSENTHAL LLP

3         Attorneys for MLIC Asset Holdings

4         7800 Sears Tower

5         233 South Wacker Drive

6         Chicago, IL 60606

7

8    BY:   PATRICK C. MAXCY, ESQ.

9         (TELEPHONICALLY)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

VERITEXT REPORTING COMPANY

6

1

2

3              P R O C E E D I N G S

4          THE REPORTER:  Appearances please for those in the

5      courtroom.

6          MR. ROSENBLOOM:  Neal M. Rosenbloom, Finkel,

7      Goldstein, Rosenbloom & Nash, attorneys for the debtor.  To my

8      left is Bernard Feldman who is the CEO of the debtor.

9          MR. GOTTESMAN:  Good morning, Your Honor.  Lawrence

10     Gottesman of Bryan Cave LLP.  With me is my partner, Brian

11     Walsh of the Bryan Cave St. Louis office.  We have previously

12     file a motion for pro hoc vice, which I think is pending before

13     Your Honor.  And I would request that Mr. Walsh be permitted to

14     speak here today since he's been given the primary

15     responsibility for this at Bryan Cave.

16         THE COURT:  Is there any objection to that?

17         MR. GOTTESMAN:  We've not seen any on the docket,

18     Your Honor.

19         THE COURT:  In the absence of any objection, I'll

20     grant the pro hoc vice motion.

21         MR. GOTTESMAN:  Thank you, Your Honor.

22         MR. PERETORE:  Good morning, Your Honor.

23     Frank Peretore, Peretore & Peretore on behalf of National City.

24         MR. ESKEW:  Good morning, Your Honor.  David Eskew on

25     behalf of the United States.

7

1      MS. RIFFKIN:  Good morning, Your Honor.

2  Linda Riffkin from the United States Trustee's office.

3      THE COURT:  All right.  National City is an unsecured

4  creditor?

5      MR. PERETORE:  National City is a lessor.  They have

6  about eleven equipment leases with the debtor, Your Honor.

7      THE COURT:  Okay.  Let's start this --

8      THE REPORTER:  Excuse me, Judge.  The party on the

9  phone?

10     MR. MAXCY:  Good morning, Your Honor.  Patrick Maxcy from

11  Sonnenschein Nath & Rosenthal on behalf of MLIC Asset Holdings.

12  Your Honor, I also have a pro hac vice motion and I'd ask the

13  Court's indulgence that I be allowed to appear this morning and

14  represent my client.

15     THE COURT:  Is there any objection to that?  All

16  right.  In the absence of objection I'm granting your motion.

17     MR. MAXCY:  Thank you, Your Honor.

18     THE COURT:  Now, MLIC is Met Life Agricultural

19  Investments?

20     MR. MAXCY:  That's correct, Your Honor.  We're an

21  affiliate of Met Life; the loan is originated by Met Life

22  Agricultural Investments.  You're right, Your Honor.

23     THE COURT:  All right.  So you're here representing

24  that secured debt?

25     MR. MAXCY:  That's correct, Your Honor.

VERITEXT REPORTING COMPANY

8

1          THE COURT:  Secured creditor, I should say?

2          MR. MAXCY:  Yes.

3          THE COURT:  Let's start this conference with a status

4     report.  Let me hear from Mr. Rosenbloom.

5          MR. ROSENBLOOM:  Your Honor, the debtor's assets are

6     in encumbered by liens that are held by FB Bank and Met Life.

7     There are also, Your Honor, numerous capital leases relating

8     the company's equipment.  We have not been granted authority to

9     use cash collateral.

10         THE COURT:  Okay.  Let's back up.  Why don't you tell

11    me about the asset structure?

12         MR. ROSENBLOOM:  Sure.  The assets of the company

13    consist of accounts receivables and inventory, a building and

14    plant facility.

15         THE COURT:  That's the one that's located in Iowa?

16         MR. ROSENBLOOM:  Yes, Your Honor.  The company also

17    has distribution centers located here in New York and in Miami

18    and in California.  Excuse me, we have distribution center in

19    California, Your Honor, but it is not ours.

20         THE COURT:  Excuse me; the distribution center that

21    is located in New York is in Brooklyn?

22         MR. ROSENBLOOM:  Yes, Your Honor.

23         THE COURT:  And is it leased or owned premises?

24         MR. ROSENBLOOM:  No, it is leased facilities,

25    Your Honor.  It's leased from the City of New York in the

VERITEXT REPORTING COMPANY

9

1    Brooklyn meat market.  It is a significant center, Your Honor.

2    We have approximately fifty employees at that center and it

3    generates approximately 1,500,000 dollars a week in sales from

4    that center, servicing the New York metropolitan area which is

5    a large customer base of the debtor.

6         THE COURT:  Have you completed your description of

7    the asset structure or is there more?

8         MR. ROSENBLOOM:  No, Your Honor.  There are

9    additional assets.  There is equipment.

10        THE COURT:  What does the equipment consist of and

11   where is it located?

12        MR. ROSENBLOOM:  The equipment consists of

13   predominantly food processing equipment which is located in

14   Postville, Iowa.  It also consists of vehicles which are leased

15   and equipment which are located in the distribution centers.

16        THE COURT:  So the equipment that is located in the

17   distribution centers is, for the most part, leased equipment?

18   I assume its vehicles and loaders and that sort of thing?

19        MR. ROSENBLOOM:  Vehicles, loaders, refrigeration

20   equipment, all of the equipment that would be necessary to

21   properly run a distribution center for meat products.

22        THE COURT:  Is that owned or leased?

23        MR. ROSENBLOOM:  Your Honor, it's a combination of

24   owned and leased equipment.

25        THE COURT:  And the food processing equipment in

VERITEXT REPORTING COMPANY

10

1    Iowa, is that the capital lease equipment that you were

2    referring to earlier?

3              MR. ROSENBLOOM:  Yes, Your Honor.  And similarly,

4    Your Honor, in that facility, in the Iowa facility, some of

5    that equipment is owned and some of it is leased.

6              THE COURT:  All right.  Go ahead, then.

7              MR. ROSENBLOOM:  And in addition to those assets,

8    Your Honor, there is also good will of the company.  The

9    company is, perhaps, the largest kosher meat distributor or was

10   the largest kosher meat distributor in the United States,

11   perhaps the world.

12             THE COURT:  All right.  Is the company operating?  Or

13   perhaps a better way to phrase the question is what is the

14   status of the company's operations at this time?

15             MR. ROSENBLOOM:  The company's operations really are

16   a skeleton of what it would be normally.  We have a reduced

17   staff since we do not have authorization to use cash

18   collateral.  We are being very, very careful.

19             THE COURT:  Describe to me the evolution of this, the

20   present situation, if you would?  Since when has the company

21   been operating at this reduced level?

22             MR. ROSENBLOOM:  Approximately eight days now,

23   Your Honor.  Certainly since the filing of the chapter.

24             THE COURT:  All right.  Go ahead.  To what extent is

25   it operating and what activity is taking place?

VERITEXT REPORTING COMPANY

11

1       MR. ROSENBLOOM:  Your Honor, we are slaughtering

2   approximately 30,000 chickens a day.  In normal operations we

3   would slaughter approximately 50,000 chickens a day.

4       THE COURT:  So the meat processing operations are

5   continuing?

6       MR. ROSENBLOOM:  In a limited degree.

7   (Pause)

8       MR. ROSENBLOOM:  Your Honor, we had also been

9   slaughtering approximately 500 cattle a day, we have curtailed

10  that operation due to the lack of funds.  Payroll for the

11  debtors' employees, this past Friday, was advanced by the

12  company's president, Mr. Rubashkin, from his own funds.  And

13  that's Mr. Abraham A. Rubashkin.

14      THE COURT:  All right.  So I take it that the

15  receiver that was appointed by the district court in Iowa is

16  not in possession?

17      MR. ROSENBLOOM:  That is correct, Your Honor.

18      THE COURT:  So approximately how many employees are

19  actually working at this point and where are they working?

20      MR. ROSENBLOOM:  Your Honor, we have approximately

21  250 employees in Iowa.  We have fifty employees in New York, in

22  Brooklyn and approximately forty to fifty employees in Florida.

23      THE COURT:  And this is the reduced level of

24  employees at all of these locations since the operations were

25  curtailed?

12

1    MR. ROSENBLOOM:  Certainly a reduced level of

2    operations in Iowa.  I believe that that's pretty close to the

3    normal operations in the two distribution centers.

4    THE COURT:  All right.

5    MR. ROSENBLOOM:  Your Honor, I'm told that during

6    peak operations the company would have 900 employees in Iowa.

7    It had dropped from that point to 600.

8    THE COURT:  And when did that occur?

9    MR. ROSENBLOOM:  That occurred on May 12th.

10    (Pause)

11    THE COURT:  All right.  Explain to me, Mr.

12    Rosenbloom, the background and how the company found itself in

13    this position, finds itself in this position I should say.

14    MR. ROSENBLOOM:  The company experienced a fairly

15    phenomenal and prolific period of growth.  It was a company

16    that was formed by Mr. Rubashkin.  It is a truly orthodox,

17    glatt kosher meat processing facility where literally an entire

18    community, an orthodox community was established in Iowa

19    outside this town.  And when I say a community I mean a

20    synagogue, a mikveh (ph.) facilities, schools, religious

21    schools.  An entire orthodox environment and community was

22    established in Pottsville.  A closed facility, I believe, was

23    purchased, renovated and established into a state of the art

24    facility which, at its peak, was doing annual sales of

25    approximately 300 million dollars a year.

13

1      THE COURT:  Give me a time frame here.  When was this

2   company established and when is the peak that you're referring

3   to?

4      MR. ROSENBLOOM:  In 1989, Judge, when the company was

5   formed the company did approximately two million dollars.  Last

6   year, the company's last calendar year, I'm told that the

7   company did sales of approximately 320 million dollars.  So it

8   has been a steady growth.

9      THE COURT:  Go ahead then, continue.

10      MR. ROSENBLOOM:  The company's financial difficulties

11   arose, I believe Judge, in May, exactly on May 12th when the

12   company experienced a raid by the United States Customs

13   Service.  At which time they found a substantial number of

14   illegal aliens who were working at the debtor's plant facility.

15      What is interesting Judge is that many of these

16   workers were working under, what the company didn't know were

17   forged documents.  And in large measure these were not people

18   who were transient workers.  Many of these individuals had

19   worked for the debtor for a lengthy period of time, had roots

20   in the community, purchased homes, were married, had children

21   and were working in the plant facility for a significant period

22   of time.

23      That incident was, shall I say, the beginning of the

24   debtor's financial difficulties.  It's president, excuse me

25   it's CEO at the time a gentleman by the name of Sholom

14

1    Rubashkin who is the son of Abraham Rubashkin who is the

2    debtor's president and sole stockholder, was compelled to

3    resign his position.

4         THE COURT:  When did that occur?

5         MR. ROSENBLOOM:  That occurred, Judge, in -- Your

6    Honor, after the raid, I'm told that he was practically

7    stripped of his decisional authority for the company.  And

8    Mr. Feldman, who is sitting on my left, was made the CEO of the

9    company in late September, early October of this year.

10        THE COURT:  So he was stripped of his authority after

11   the raid.

12        MR. ROSENBLOOM:  Yes, Your Honor.

13        THE COURT:  And Mr. Feldman took over in September,

14   October.  Who was running the company between May and

15   September?

16        MR. ROSENBLOOM:  Well, Your Honor, he was in the

17   facility but the decisional prerogatives that he otherwise had

18   were taken away from him.

19        THE COURT:  So who had those prerogatives then?

20        MR. ROSENBLOOM:  The major decisions, Your Honor,

21   were made by Mr. Aron Rubashkin, the president and sole

22   stockholder of the debtor.  The day to day decisions were made

23   by other members of the Rubashkin family who were located at

24   the plant facility.

25        THE COURT:  You mean Abraham Rubashkin, right?

15

1          MR. ROSENBLOOM:  Yes, Abraham Rubashkin.  Yes, it's

2    Abraham A. Rubashkin.  He's referred to as Aron.

3          THE COURT:  All right.  Well, go ahead.

4          MR. ROSENBLOOM:  There then came an incident,

5    Your Honor, in October with our bank where the company has a

6    deposit agreement with its bank, FB Bank.  And rather than

7    accounts receivables being deposited directly into the deposit

8    account monies were deposited into the company's operating

9    account.

10          THE COURT:  And how did that occur?  Why did that

11    occur?

12          MR. ROSENBLOOM:  It should not have occurred, Your

13    Honor.  And the monies were desperately needed for operations,

14    for business operations.  And I'm told that if the monies were

15    deposited into the deposit account it takes a period of

16    approximately two days before those funds would otherwise have

17    been available for the needs of the company.

18          THE COURT:  How much money are we talking about that

19    was deposited into the operating account instead of into the

20    deposit account where it should have been?

21          MR. ROSENBLOOM:  Approximately 1,300,000 dollars,

22    Your Honor.

23          THE COURT:  Go ahead.

24          MR. ROSENBLOOM:  That, Your Honor, caused the

25    commencement of litigation by the bank which immediately

VERITEXT REPORTING COMPANY

16

1    stopped funding the company and brought us to where we are

2    today.

3              THE COURT:  Are there any regulatory or governmental

4    actions pending against the debtor?

5              MR. ROSENBLOOM:  Yes, Your Honor, there are.

6              THE COURT:  Would you tell me about those, please?

7              MR. ROSENBLOOM:  Certainly.  The immigration

8    authorities are still continuing their investigation of the

9    debtor.  And we do expect that there may be a criminal

10   proceeding commenced against Mr. Sholom Rubashkin, incident to

11   those employment activities.

12        (Pause)

13             MR. ROSENBLOOM:  I'm also advised, Judge, that the

14   State of Iowa has commenced employment and wage actions against

15   Agriprocessors and others based upon child labor violations.

16        (Pause)

17             MR. ROSENBLOOM:  And it was also --

18             THE COURT:  When did that occur?

19             MR. ROSENBLOOM:  In August, Your Honor.

20             THE COURT:  What's the status of that proceeding?

21             MR. ROSENBLOOM:  There was a fine which was assessed

22   against -- I'm sorry, Your Honor --

23        (Pause)

24             MR. ROSENBLOOM:  I'm sorry.  Your Honor, I'm told

25   that those proceedings remain ongoing and that a trial is

VERITEXT REPORTING COMPANY

17

1    scheduled at or about April of next year.

2         THE COURT:  So that is not stayed?

3         MR. ROSENBLOOM:  It would appear to me, Your Honor,

4    that those proceedings would not be stayed as criminal action.

5         THE COURT:  Wasn't there an arrest?

6      (Pause)

7         MR. ROSENBLOOM:  Your Honor, I think what Your Honor

8    is referring to is the arrest of Sholom Rubashkin which took

9    place approximately two weeks ago.

10        THE COURT:  By what authority was he arrested?

11     (Pause)

12        MR. ROSENBLOOM:  He was arrested by ICE agents,

13   that's the customs -- I'm sorry; the Immigration and Customs

14   Enforcement agency.  And that is being handled by the U.S.

15   Attorney's office, Northern District of Iowa.

16        THE COURT:  Is he incarcerated at the present time?

17        MR. ROSENBLOOM:  No.  No, he is not, Your Honor.

18        THE COURT:  So when did the debtor drastically

19   curtail its operations?

20        MR. ROSENBLOOM:  Approximately two weeks ago,

21   Your Honor.

22        THE COURT:  And it was because of the cutoff of

23   funding?

24        MR. ROSENBLOOM:  Correct.

25        THE COURT:  What you've told me, if I understand it

1    correctly, is that following the raid that took place in May

2    the debtor's business went downhill.  Tell me how that happened

3    and what occurred, exactly, which ultimately resulted in the

4    funds being deposited in an improper account and the cutting

5    off of funding.

6            MR. ROSENBLOOM:  Sure.  Your Honor, the problem

7    fundamentally was a re-staffing problem.  There were 389

8    employees that were arrested at that time.

9            THE COURT:  389 out of approximately 900?

10           MR. ROSENBLOOM:  Correct.  And it caused a tremendous

11   re-staffing problem, having to hire new employees, employees

12   who were not trained in the rather specialized work which is

13   involved in the debtor's operation.  And it caused production

14   to decline fairly significantly.

15           THE COURT:  Anything else you want to tell me?

16           MR. ROSENBLOOM:  I can certainly tell you what we

17   intend to do on a go forward basis.

18           THE COURT:  That was going to be my next question.

19   What is your exit strategy?

20           MR. ROSENBLOOM:  Well, since filing the Chapter 11,

21   Judge, we've have been in earnest negotiations with several

22   different sources of debtor in possession financing.

23           THE COURT:  What would be those sources?

24           MR. ROSENBLOOM:  Well, they are sources from the

25   local community.  They are sources from outside of the local

19

1    community.

2        THE COURT:  Which local community are we talking

3    about now?

4        MR. ROSENBLOOM:  We're talking about the Brooklyn

5    local community, the Jewish orthodox local community in

6    Brooklyn.  This is a very important institution for the local

7    Brooklyn community.

8        THE COURT:  So what would you anticipate that this

9    DIP financing would do?  How much are you looking for?  What --

10       MR. ROSENBLOOM:  We are looking -- I'm sorry, Your

11   Honor.

12       THE COURT:  Sorry.

13       MR. ROSENBLOOM:  Did I cut you short?

14       THE COURT:  Well, maybe you need to back up a bit and

15   explain the debt structure a bit.

16       MR. ROSENBLOOM:  Sure.

17       THE COURT:  I'm aware of the -- I've seen what is on

18   your petition but I'm unclear about who holds an interest in

19   what.

20       MR. ROSENBLOOM:  Sure.  Let me try to explain that.

21   Our debt structure -- we figure, Your Honor, that there is

22   approximately thirty-four million dollars which is owed to FB

23   Bank.  They have been collecting receivables during the

24   pendency of the case.  I don't have the exact amount that's

25   owed to them at the present time but I think that it should be

20

1    in the neighborhood of between thirty-two and thirty-four

2    million dollars.

3            THE COURT:  This was a revolving facility, I take it?

4            MR. ROSENBLOOM:  Correct.

5            THE COURT:  And it was secured by?

6            MR. ROSENBLOOM:  Secured by the inventory, the

7    accounts receivables and equipment.  No, I'm sorry, Your Honor,

8    it's inventory and accounts receivables which has a book value,

9    Your Honor, of approximately forty-five million dollars.

10           THE COURT:  Do they have an interest in any of the

11   debtor's other assets?

12           MR. ROSENBLOOM:  I don't believe so, Your Honor.

13           THE COURT:  All right.  The other two creditors are

14   Farm Credit Leasing and Met Life Agricultural Investment, is

15   that right?

16           MR. ROSENBLOOM:  Met Life Agricultural Investment has

17   a first mortgage; I believe it's called a deed of trust in

18   Iowa, on the debtor's real property.  They are owed

19   approximately 9.6 million dollars and we believe, Judge, we

20   show the book value of the building and plant facility and the

21   debtor's land at approximately forty million dollars.

22           THE COURT:  Is this a purchase money mortgage or is

23   it --

24           MR. ROSENBLOOM:  No, Your Honor.  It is not.

25           THE COURT:  Is this a revolving one?

VERITEXT REPORTING COMPANY

21

1          MR. ROSENBLOOM:  No, this is a straight real estate

2     mortgage.

3          THE COURT:  All right.  What about Farm Credit

4     Leasing?

5          MR. ROSENBLOOM:  We believe, Judge, that our capital

6     leases, the total amount of the debt on the capital lease is

7     approximately -- I'm told that Farm Credit Leasing is owed

8     approximately six million dollars.  And the totality of our

9     capital leases, Your Honor, is approximately ten million

10    dollars.

11         THE COURT:  So Farm Credit Leasing has financed six

12    million of the capital leases?

13         MR. ROSENBLOOM:  That's correct.

14         THE COURT:  Is the other four million dollars of

15    capital leases financed?

16         MR. ROSENBLOOM:  Yes, Your Honor.

17         THE COURT:  By the lessors?

18         MR. ROSENBLOOM:  By various lessors, correct.

19         THE COURT:  So you're looking for DIP financing, tell

20    me more about what the strategy would be, how much you would be

21    obtaining, what you would use it for.

22         MR. ROSENBLOOM:  Absolutely.  Judge, just on the debt

23    side, if we may as well, there are approximately eight and a

24    half million dollars of trade creditors and approximately ten

25    million dollars of various loans that have been made the to

22

1    company by family members and others.

2            THE COURT:  Loans by insiders, in other words?

3            MR. ROSENBLOOM:  Some are insiders, some are not.

4            THE COURT:  And these are not secured loans?

5            MR. ROSENBLOOM:  Correct.

6            THE COURT:  All right.  Go ahead, please.

7            MR. ROSENBLOOM:  Your Honor, we intend to obtain

8    between five and ten million dollars of debtor in possession

9    short term financing.

10           THE COURT:  What will you do with that?

11           MR. ROSENBLOOM:  We will use that money to resume

12   operations while at the same time we'd collect the company's

13   assets and liquidate out the position of FB Bank.  We would

14   intend to give the debtor in possession lender a lien on post-

15   petition inventory and accounts receivables and a subordinate

16   lien on the debtor's real property where there is a very

17   substantial equity cushion.

18           Our books reflect that the real property has a value

19   of forty million dollars.  And as I indicated, the amount of

20   the Met Life mortgage is approximately 9.6 million dollars.  We

21   are in the process of getting an updated appraisal for the

22   property.

23           THE COURT:  So you wouldn't be using the collateral,

24   you'd be collecting these receivables and paying the proceeds

25   directly to --

23

1          MR. ROSENBLOOM:   Correct, that is our intention.

2          THE COURT:   -- First Business Capital.

3          MR. ROSENBLOOM:   That is our intention.

4          THE COURT:   So what's your exit strategy here?

5          MR. ROSENBLOOM:   Our exit strategy, Your Honor, is to

6    find a new source of permanent financing.   And we believe that

7    this is something that is extremely viable and possible.   And

8    we're also entertaining the possibility of having new equity

9    investors to assist in the exit in the Chapter 11 proceeding.

10         THE COURT:   The problem that led to the erosion of

11   the debtor's business is not something that you've addressed in

12   this discussion.

13         MR. ROSENBLOOM:   Well, it's something, obviously

14   Your Honor, which we have -- we believe we have ameliorated.

15   We have brought in a staffing company and we also have --

16   excuse me for one moment.

17        (Pause)

18         MR. ROSENBLOOM:   And Judge, we've also brought on a

19   former U.S. attorney in St. Louis, a gentleman by the name of

20   James Martin, to serve as our compliance officer to make

21   certain that the problems that surfaced previously do not

22   repeat themselves and become historical.

23         THE COURT:   Anything else you want to tell me right

24   now?

25         MR. ROSENBLOOM:   I'm also told, Judge, that we have

VERITEXT REPORTING COMPANY

24

1   enrolled in a government program which allows for employment

2   verification, immediate employment verification, which we are

3   using with all of our hires.  It's a computer system it's

4   called E-Verification.  And we are using that on a go forward

5   basis with all of our employees.

6       The business itself, Judge, is a very viable

7   business.  It's a growing business or it had been, of course, a

8   growing business.  It's extremely profitable.  It is something

9   that has a tremendous reputation within the orthodox Jewish

10  community, which has a need for this product and which we have

11  filled for a significant period of time.  And there really is

12  nobody else -- there is nobody else that fills this need.  We

13  really do have a captive clientele, captive customer base.

14      THE COURT:  All right.

15      MR. ROSENBLOOM:  And with that being said, Judge, in

16  broader strokes that's where we are and that's what our

17  ultimate, immediate plans are.  We hope, within the next week

18  to ten days, to have an order to Your Honor for debtor in

19  possession financing.  Our discussions with prospective lenders

20  have been continuous and ongoing.  I can report to Your Honor

21  that yesterday morning, through the early afternoon, Mr. Nash,

22  Mr. Feldman and myself with Mr. Rubashkin were talking with

23  various prospective debtor in possession lenders before coming

24  to this hearing.

25      I was speaking with a prospective lender and we're

25

1    very confident that we're going to be in a position to go

2    forward on that basis quickly.

3          There are certain immediate issues that come up which

4    we've been speaking to the bank about, not the least of which

5    is we have an inventory, Judge, of 900,000 chickens.  To me

6    it's a mind boggling, sort of, concept but we have been working

7    with the bank to allow us to use cash collateral on a short

8    term basis for the limited purpose of feeding the chickens.  We

9    would also be asking the bank, probably in the near future, for

10   authorization to use cash collateral to maintain utility

11   services and to maintain insurance for the debtor's operations.

12         THE COURT:  Is there insurance in place now?

13         MR. ROSENBLOOM:  I believe that there is, Your Honor.

14         THE COURT:  So what type of insurance is in place?

15     (Pause)

16         MR. ROSENBLOOM:  Your Honor, I'm told that we have

17   liability insurance, workers compensation insurance, property

18   insurance and general business insurance.

19         THE COURT:  Anything else you want to put on the

20   record right now?

21         MR. ROSENBLOOM:  No, Your Honor.  That's it for now.

22         THE COURT:  Okay.  Thank you.  This is a hearing, the

23   outcome of which is going to be the scheduling of a hearing on

24   the pending motion for change of venue.  And I have read the

25   papers that have been filed on that.  I don't think I need to

26

1    hear argument on the whole change of venue at this point,

2    unless there's something that you feel needs to be put on the

3    record.

4         But my thinking is that it's going to be necessary to

5    have an evidentiary hearing. And I think that it does make

6    sense to resolve the venue question before the other

7    substantive questions, if that's possible to do. So I was

8    thinking about an evidentiary hearing for next week, which

9    actually doesn't even curtail the notice period very

10   substantially, since the motion was filed on the 6th.

11        MR. ROSENBLOOM:  If I may, Your Honor.  I am working

12   with my partner, Mr. Nash, on this and this is his case.  He is

13   actually engaged and on trial, as we're speaking, before Judge

14   Lynch in the district court.  And that trial is going to

15   continue through this week.

16        THE COURT:  Well Mr. Nash, what do you think I should

17   do?

18        MR. ROSENBLOOM:  I would ask, Your Honor, that the

19   hearing on venue be scheduled and held -- we would want a week

20   from Friday within which to submit our opposition papers.

21        THE COURT:  A week from Friday.  So you're not

22   planning on seeking approval of DIP financing prior to that?

23        MR. ROSENBLOOM:  No, we certainly are planning on

24   bringing on a motion for DIP financing prior to that time.

25   Absolutely, Judge.  Whether this case is venued here or whether

1    this case is venued in Iowa, we are going to need DIP

2    financing.  I don't see that one curtails the other.

3              THE COURT:  What is the basis for venue here?

4              MR. ROSENBLOOM:  Our basis for venue?

5              THE COURT:  Yes.

6              MR. ROSENBLOOM:  This is clearly the debtor's nerve

7    center, Judge.  Its executive offices are here.  Its brains

8    center is here.  It has a significant distribution center here,

9    which is responsible for no less than twenty-five percent of

10   its sales.  All of its major decisions emanate from here and

11   not from anywhere else.

12             THE COURT:  So you're saying this is its principle

13   place of business?  Let's operate within the context of the

14   venue statute, what is the basis for venue here?

15             MR. ROSENBLOOM:  That this is a principle place of

16   business, correct.

17             THE COURT:  Can you have more than one principle

18   place of business?

19             MR. ROSENBLOOM:  Yes, I believe so.

20             THE COURT:  I thought principle would imply that it

21   was the only one.  I haven't seen that in the cases that you

22   could have more than one principle place of business.

23             MR. ROSENBLOOM:  This is the company's nerve center.

24   This is the place where its sources of DIP financing, in all

25   likelihood, will come from.  This is the source where we

28

1    believe its exit financing is going to come from.  This is

2    where its nerve center is and this is where we have twenty-five

3    percent of our sales emanating from.

4           THE COURT:  How are you planning to address the

5    various filings that the debtor has made with authorities and

6    in other courts where they state that their principle place of

7    business is in Iowa?

8           MR. ROSENBLOOM:  They certainly do have a principle

9    place of business in Iowa.  And I think that the term principle

10    place --

11           THE COURT:  Is there a case that says you can have

12    more than one principle place of business?

13           MR. ROSENBLOOM:  Judge, I have not -- I'm really not

14    prepared to comment on that now.

15           THE COURT:  Well that, I would think, would be an

16    issue that you're probably going to have to address.

17           MR. ROSENBLOOM:  No question about it, Judge.  No

18    question about it.

19           THE COURT:  Okay.

20           MR. ROSENBLOOM:  And we certainly do plan on

21    addressing that.

22           THE COURT:  As I say, I am inclined, given the facts

23    and the fact that a change of venue motion was made very

24    promptly after this case was filed, to hear it on an expedited

25    basis.  And I do think, given the types of representations

29

1    you're making on the record that it's going to be necessary for

2    you to present evidence.  I don't think this is going to be

3    able to be decided on the papers.

4          MR. ROSENBLOOM:  I agree.

5          THE COURT:  So I think we need to set a date for an

6    evidentiary hearing.

7          MR. ROSENBLOOM:  I would just ask, Your Honor, that

8    we be allowed -- that Mr. Nash be allowed to participate in the

9    preparation of our defense.  And as I said he is on trial on a

10   federal copyright litigation before Judge Lynch which is

11   scheduled to take the balance of the week.  So he is going to

12   be unavailable to us, to assist us, until next week.  And I

13   would ask, Judge, that we be allowed to submit our opposition

14   papers a week from Friday.

15         THE COURT:  Well, I don't think -- Mr. Rosenbloom, I

16   don't think that that would mean that the hearing would be some

17   time after that, correct?

18         MR. ROSENBLOOM:  That is correct.

19         THE COURT:  I don't think I'm going to push this out

20   beyond a week from Friday.  If we were going to have a hearing

21   I think that would be the latest that we would go.  That

22   wouldn't even be shortened notice.  So I don't think it's a

23   realistic idea to think that I'm going to push this to after

24   Thanksgiving.  And I myself have a trial during the week before

25   Thanksgiving.  So I don't think it's a realistic notion that

1   this is going to be heard in December.  It doesn't seem

2   appropriate to me.

3           MR. ROSENBLOOM:  Your Honor, as much time as you can

4   possibly give us would be appreciated, as I said.

5           THE COURT:  All right.  I'll hear from the other

6   side.

7           MR. WALSH:  Good morning, Your Honor.  Brian Walsh on

8   behalf of Bryan Cave on behalf of First Bank Business Capital.

9           Your Honor, we would encourage the Court to get to

10  the venue issue as quickly as possible.  I understand that

11  Mr. Nash may be tied up but this is a straightforward issue.

12  All of the sources of proof that the debtor may need to try to

13  establish that its principle place of business, and by the way

14  the statute says the principle place of business in the United

15  States.  All of the evidence that the debtor may wish to rely

16  on to try and establish that is readily within the debtor's

17  control.

18          Probably a half hour worth of testimony from

19  Mr. Feldman, if that much, would establish the basis for his

20  belief that the principle place of business is here.  The other

21  witnesses, whoever the debtor may need to call, are all within

22  the debtor's control.  Documentary evidence that they may wish

23  to put in the record is within the debtor's control.

24  Information about the Brooklyn facility, the Brooklyn wholesale

25  meat market stall and loading dock that the debtor has there is

31

1    readily within the debtor's control.  There's no need for a

2    lengthy warm up to this hearing.  It's a very straightforward

3    question.  And we agree that it makes sense to get to it

4    quickly.  And there are going to be a number of substantive

5    matters coming along which may include issues about cash

6    collateral, they may include issues about Chapter 11 trustees.

7    They may include issues about relief from the automatic stay.

8    And there doesn't seem to be a whole lot of sense of getting

9    all that tangled up if the case is going to be heading to Iowa

10   in the very near future.

11          So we think it's straightforward.  And while Mr. Nash

12   probably has a few days head start on Mr. Rosenbloom with this

13   case, but to our understanding not much more than that, that

14   may have some relevance to the big picture here.  We don't

15   think that's particularly relevant to the straight forward

16   question of where the company's principle place of business is.

17          MR. ROSENBLOOM:  Your Honor -- I'm sorry; are you

18   finished Mr. Walsh?

19          MR. WALSH:  I think so.  Yes.

20          MR. ROSENBLOOM:  Your Honor, there are lots of

21   concerns and considerations that go into a venue motion.  It's

22   also the interest of creditors, convenience of witnesses.

23   There are a lot of things that go into a venue motion; it's not

24   just the principle place of business.

25          I don't believe that it is simply as straightforward

VERITEXT REPORTING COMPANY

32

1   as counsel makes it out to be and there is absolutely no

2   prejudice, at this point, for their being a short adjournment.

3   Our need for DIP financing is going to be in existence whether

4   we're here or whether we're in Iowa.  And Mr. Nash, I know,

5   would want to be here to try this case and I'm just trying to

6   obtain as much time as I possibly can for him to adequately

7   prepare the debtor's defense, which I think it's self-serving,

8   at best, for counsel to describe it as straightforward and

9   simple.

10              THE COURT:  All right.

11              MR. MAXCY:  Your Honor, if I may just briefly,

12  speaking on behalf of one of the other major secured creditor.

13  It is my belief that this should move forward as quickly as

14  possible as well.  And it would be both for the convenience and

15  benefit of most of the creditors in this case, at least of the

16  creditors that I'm interested in, to have the venue proceeding

17  heard as quickly as possible.

18              MR. PERETORE:  I would also concur on that, Your

19  Honor.

20              THE COURT:  Go ahead.

21              MR. PERETORE:  Just briefly, Your Honor.  The

22  evidence on the current record seems to be overwhelmingly in

23  favor of Iowa jurisdiction.  You've got an Iowa corporation.

24  Just as recently as August they said that the principle place

25  of business, in their own filings, is Iowa.  You've got many

33

1    dozens of small trade creditors in Iowa.  You have Iowa State

2    having an interest in the criminal and the wages.  The evidence

3    seems to be overwhelming.  And if it's going to be headed there

4    it seems inappropriate to have substantive issues addressed

5    here where many creditors can't participate.

6         So I would also ask that it be done on an expedited

7    basis.

8         THE COURT:  Well, let me tell you the dates that I

9    can give you and maybe you can take a minute to confer and see

10   if you can find a schedule that is acceptable to both the

11   moving party and the debtor.

12        I can give you November 18th.  I could hear you on

13   November 21st.  I could hear you on --

14   (Pause)

15        THE COURT:  I can give you the 25th or the 26th of

16   November -- 24th or the 25th, excuse me, of November.  And I

17   have time available during the week of December 1st.  So why

18   don't you talk and see -- here's what I would like to see, in

19   advance of this hearing.  The debtor can file a written

20   response, and I would want the parties to file a joint pre-

21   trial order which I would want to get thirty-six hours before

22   the trial, let's say.

23        And I'm anticipating this would not take more than a

24   day.  Do you think that that is an underestimation of the

25   amount of time that would be required to try this?  That seems

34

1    about right to me.

2            MR. WALSH: Perhaps less.

3            THE COURT: Perhaps less, okay. All right. So those

4    are the available dates in the upcoming few weeks. Why don't I

5    step down and let you confer to see if you can arrive at a

6    schedule that enables you both to file whatever you feel is

7    necessary, both sides to file whatever you think is necessary

8    and sets it down for a prompt hearing.

9            THE REPORTER: All rise.

10       (Recess from 12:01 till 12:20 PM)

11           THE COURT: You may be seated. So you've agreed on a

12   date?

13           MR. ROSENBLOOM: We did, Your Honor. We have. We

14   have selected the 25th as the date for the evidentiary hearing.

15   We have agreed that we would have our responsive papers to

16   counsel by the close of business on the 18th.

17           THE COURT: Can you file your joint pre-trial order

18   by the 21st?

19           MR. ROSENBLOOM: Yes, Your Honor.

20           MR. WALSH: We can do that. I think it may be an

21   overstatement to say that we agreed on the response date of the

22   18th. If that is the response date and the pre-trial order is

23   due on the 21st, that would leave two days for discovery. We

24   think we're entitled to know what the debtor's position is

25   before taking discovery and we may need to take discovery more

35

1   or less simultaneously in New York and in Iowa.  And we would

2   request that the responsive papers be due no later than a week

3   from today.  And that the debtor be in a position to defend

4   depositions in both jurisdictions simultaneously.

5          MR. ROSENBLOOM:  Which is why, Your Honor, I had

6   asked -- amongst other reasons why I had asked that this be

7   pushed out a little further.  It's very fast track, Judge.

8          THE COURT:  Well, and I think it has to be on a fast

9   track, Mr. Rosenbloom.

10         MR. ROSENBLOOM:  I'm not saying that I'm looking to

11  delay this, Your Honor.  But we're talking about simultaneous

12  depositions in Iowa and here in New York.  It's just a very,

13  very fast track.

14         THE COURT:  What depositions are you going to be

15  taking?

16         MR. WALSH:  Your Honor, that depends, a part, upon

17  the debtor's position.  But it's certainly conceivable that we

18  would take a corporate 30(b)(6) deposition.  We may, in

19  addition, wish to depose Mr. Feldman, Mr. Aron Rubashkin,

20  perhaps Mr. Sholom Rubashkin and perhaps the chief financial

21  officer who is Iowa, Toby Ben-Sasson (ph.).

22         Depending on whether certain matters are conceded in

23  the papers, some of that may be unnecessary.

24         THE COURT:  Well, how would it be -- what if we set

25  the hearing for a date in the first week of December?  Is that

36

1    really going to make such a material difference to you and it

2    would probably make it easier to get the discovery that you

3    want?

4            MR. WALSH:  Well, the only difference there is --

5    we'd have to take discovery around Thanksgiving, which I think

6    is probably not really going to accomplish anything.  We think

7    it's doable if the papers are in next Monday, Your Honor, and

8    we see it's out there.  We may pre-notice some depositions and

9    then cancel them.  It's doable to have the hearing on the 25th.

10   We just think more than forty-eight hours between when the

11   responsive papers are due and when the pre-trial order is due

12   is probably the key here.

13           THE COURT:  Well if we put the --

14           MR. ESKEW:  Your Honor, if I may also?

15           THE COURT:  Sorry.  I'm just thinking about the

16   schedule.  If we put this on for, say, November 3rd, you would

17   be --

18           MR. WALSH:  December.

19           THE COURT:  I don't mean November, I meant to say

20   December.  Sorry.  December 3rd, you would have some additional

21   time to prepare your pre-trial order.  You would have this week

22   and next for your discovery and then you'd have more time for

23   the other.  And you're saying you don't think anyone's going to

24   be available for depositions during the three days before

25   Thanksgiving?  I could give you until Monday, December 1st, to

1    prepare your joint pre-trial order.

2         MR. ESKEW:  Your Honor, if I may?  Just on behalf of

3    the government, part of the reason why we discussed the

4    November 25th date, from our perspective, is that I will be

5    unavailable the first two weeks of December at mandatory

6    training.

7         THE COURT:  Is the government planning on

8    participating in this?

9         MR. ESKEW:  AT this point, Your Honor, we're

10   considering still what our position will be.  At a very

11   preliminary stage --

12        THE COURT:  Which branch of the government are you

13   representing?

14        MR. ESKEW:  I'm with the U.S. Attorney's office.

15   We're representing, at this point, the United States Department

16   of Agriculture which has several claims, in addition to

17   enforcement interests with respect to the debtors.

18        THE COURT:  What types of claims?

19        MR. ESKEW:  We have claims rising out of two agencies

20   within the United States Department of Agriculture for hourly

21   fees and wages that were incurred by inspection officers, doing

22   inspections on the meat as well as grading services.  Those are

23   the monetary claims.  In addition to that we have enforcement

24   claims.

25        THE COURT:  So you want to participate and you're not

1    available the first two weeks of December?

2            MR. ESKEW:  That's correct, Your Honor.

3            THE COURT:  Then why don't we go ahead on the 25th.

4    I'm going to direct the debtor to put in their opposition

5    papers next Monday, the 17th.  And I want the joint pre-trial

6    order before noon on the 24th.

7            Is there anything else that needs to be -- that will

8    need to be file?

9            MR. MAXCY:  Your Honor, will there be an opportunity

10   for the moving parties to present a reply brief in response to

11   the debtor?

12           THE COURT:  If you think that's really necessary.

13   This is going to be decided on -- we're heading to an

14   evidentiary hearing here.  You'd be putting in legal argument?

15           MR. MAXCY:  Well, Your Honor, we may need to put in

16   legal argument to set the basis.  I know there'll be an

17   evidentiary hearing but quite frankly there's no much in the

18   papers so far about the legal basis for picking principle place

19   of business and we may need to address that subsequently.

20           THE COURT:  All right.  Well, then you can file a

21   reply before noon on the 24th also.

22           MR. MAXCY:  Thank you, Your Honor.

23           THE COURT:  Does anyone have anything else that needs

24   to be taken into consideration in this?

25           MR. GOTTESMAN:  Simply, what time will we be starting

39

1    on the 25th, Your Honor?

2              THE COURT:  How is 10 o'clock?

3              MR. GOTTESMAN:  That should be fine.  Thank you.

4              MS. RIFFKIN:  Your Honor --

5              THE COURT:  Ms. Riffkin?

6              MS. RIFFKIN:  -- I just want to advise the Court that

7    my office is considering filing a motion for the appointment of

8    a Chapter 11 trustee.  We have very strong concerns with

9    respect to the reasons why this case is filing for bankruptcy

10   and with respect to the governance issues in this case.

11             THE COURT:  Well, Ms. Riffkin, if you're going to do

12   that can you bring it on for the 25th?

13             MS. RIFFKIN:  Yes I can, Your Honor.

14             THE COURT:  All right.  Let me ask you this question,

15   Mr. Rosenbloom, what is the status of this company's Orthodox

16   Union certification?  It's kosher certificate?

17             MR. ROSENBLOOM:  It's in place, Your Honor.  I don't

18   believe that there is an issue.

19             THE COURT:  There's no issue?  Okay.  All right.

20   Then Ms. Riffkin, if you're going to do that should we set a

21   schedule for that so that there'll be adequate time for the

22   debtor to respond to that?

23             MS. RIFFKIN:  That's fine.  Yes, Your Honor.

24             THE COURT:  So when would you be able to make that

25   motion, if you're going to make it?

1          MS. RIFFKIN:  We can file our brief, Your Honor --

2     our motion, Your Honor, by Friday, this Friday.

3          THE COURT:  The 14th?

4          MS. RIFFKIN:  Yes.

5          THE COURT:  All right.  And I guess we can give the

6     debtor till when to respond?  What would you propose?

7          MS. RIFFKIN:  Let me just check my calendar.  I'd

8     give them until the 19th to respond, Your Honor.

9          THE COURT:  I think I would give them a bit more time

10    then that.

11         MS. RIFFKIN:  However much they want.

12         THE COURT:  Let's say the 21st.

13         MS. RIFFKIN:  21st is acceptable, Your Honor.

14         THE COURT:  All right.  I'm just making a few notes

15    here.

16        (Pause)

17         THE COURT:  The hearing will be on the 25th.  The

18    debtor's response to the pending motion will be due on the

19    17th, in one week.  The joint pre-trial order will be filed on

20    the 24th and any reply that the creditor wants to file to the

21    debtor's response to the motion for a change of venue will be

22    filed on the 24th, prior to noon.  The U.S. Trustee's motion to

23    appoint a Chapter 11 trustee will be filed on the 14th of

24    November and the debtor's response by the 21st, close of

25    business on the 21st.  I'd guess that the U.S. Trustee's office

1  can file a reply before noon on the 24th, if you want.

2          MS. RIFFKIN:  Thank you, Your Honor.

3          THE COURT:  If you're planning on taking expedited

4  discovery do you need some kind of order that would enable you

5  to dispense with the normal period of notice for that, for

6  discovery?  Should we address that now?

7          MR. WALSH:  Your Honor, I haven't contemplated

8  whether we would do written discovery.  And if so, that would

9  need to be expedited.  I was contemplating depositions.  I

10  assume that we will be able to work together on that.

11          THE COURT:  All right.

12          MR. WALSH:  I'd be happy to talk about how to get

13  that done and revisit that with the Court if there's a problem.

14  But my assumption is that we can find a way to get that done.

15          THE COURT:  All right.  That's fine then.  Is there

16  anything else that needs to be put on the record?  Okay. I'll

17  issue an order with all of these dates in it.  And it'll have a

18  form of joint pre-trial order attached.

19          All right.  Thank you.

20          IN UNISON:  Thank you, Your Honor.

21          THE REPORTER:  All rise.

22      (Proceedings Concluded at 12:31 PM)

23

24

25

42

1

2                          C E R T I F I C A T I O N

3

4       I, Pnina Eilberg, certify that the foregoing transcript is a

5       true and accurate record of the proceedings.

6

7       _____

8       Pnina Eilberg

9

10      Veritext LLC

11      200 Old Country Road

12      Suite 580

13      Mineola, NY 11501

14

15      Date:  November 11, 2008

16

17

18

19

20

21

22

23

24

25